# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>MICHAEL ALLEN MYERS,<br><br>Appellant. | No. 59781-1-II<br><br><br><br>UNPUBLISHED OPINION |

GLASGOW, J.—Police found three stolen vehicles at Michael Myers' home, and after an investigation they learned he also took items from a neighbor's barn. The State charged Myers with three counts of possession of a stolen motor vehicle, one count of second degree burglary for entering the barn and stealing items, one count of third degree theft, and one count of third degree malicious mischief for breaking the lock on the door of the barn.

At trial, the child of one of Myers' friends testified that Myers took the child with him to the barn to steal items the night before Myers was arrested. The barn's owner testified that at least one item was missing from the barn, and he said that a padlock on the barn door had been broken. Text messages between Myers and a friend, also on the night before Myers was arrested, discussed going back to the barn as well as breaking a car ignition. Three of the stolen vehicles on the property had notable indications they had been stolen, such as fraudulent trip permits, missing license plates, a stolen battery, and punched ignitions.

A jury convicted Myers of all charges. Myers appeals. He argues that the evidence at trial was insufficient to prove (1) he had knowledge that the vehicles were stolen; (2) the burglary, theft, and malicious mischief occurred within the time period stated in the information and the to-convict jury instructions; and (3) that specific items were stolen from the barn.

We hold that sufficient evidence supported Myers' convictions for all six counts. We affirm.

FACTS

On February 9, 2023, detectives visited Michael Myers' mother's home, where Myers was staying, to follow up on an unrelated investigation. While there, a detective saw several cars on the property, including a black 1997 Nissan pickup truck in the driveway. Police ran the license plate for the 1997 Nissan truck and learned that the vehicle was stolen.

Detectives then left the property to obtain a warrant to search the property. When they returned to the property, they saw a young child, TJ, sitting in the passenger seat of the black Nissan truck. In the house were Myers, his mother, and Myers' friend, Sonny Castro.

Detectives searched the property and found three stolen vehicles: the black 1997 Nissan truck, a 1993 Nissan truck, and a 2012 Hyundai Elantra. The Hyundai was missing license plates, its hood was open, the ignition was damaged, and it had a forged trip permit. The 1997 Nissan truck had a damaged steering column and contained a screwdriver that Myers used to start the truck. The 1993 Nissan was missing its battery. When questioned, Myers said that all three cars belonged to his friend Castro. The detectives arrested Myers.

Myers had been driving TJ to and from school to help TJ's parents. Detectives drove TJ home. During this drive, TJ showed the detectives a barn on a nearby property where he would go

with Myers to take things. The property had fencing with no trespassing signs visible, and the driveway was blocked by a chain.

When the property owner went to the barn with the detectives, he noted that his regular padlock had been broken and replaced with a different lock. Detectives were able to open the new padlock on the barn with a key they obtained from Myers' key ring. The barn owner said that items were missing from the barn, most notably, a tile cutter.

Police arrested Myers and recovered his cellphone. The phone contained text messages between Myers and Castro from the night before Myers was arrested where they mentioned loading up the truck at the barn and discussed how TJ wanted to go to the barn.

The State charged Myers with three counts of possession of a stolen motor vehicle, one count of second degree burglary for breaking into the barn, one count of third degree theft for the items stolen from the barn, and one count of third degree malicious mischief for the damage to the lock made when entering the barn. All of the crimes had charging periods of "on or about" February 8 or 9, the day before and the day of Myers' arrest. Clerk's Papers (CP) at 123-24.

II. JURY TRIAL

A.   Trial Testimony

At trial, TJ testified that he and Myers would often go to the barn to steal items. To get in, Myers cut the existing lock with bolt cutters and put on his own lock instead. TJ stated that the night before the police arrived at Myers' property, he and Myers had taken things from the barn "like, a chair, some antique items, wooden, and a small, [] toy red trailer." 17 Verbatim Rep. of Proc. (VRP) at 359. TJ said, "[T]he day that it happened it was nighttime, and then the next day

3

he got arrested after we went to the barn," indicating that the theft took place on February 8 or 9 *Id.*

The owner of the barn testified that he went to the property "maybe like once a week or every other week" and that the only other person who was allowed there was his handyman. 15 VRP at 154. He stated that when he went to the barn with law enforcement, he noticed that a tile cutter was missing. As far as other items, the barn owner said that he could not tell for sure what else was stolen, but he remembered the tile cutter because it was valuable.

B.    Text Messages

The trial court admitted text messages between Myers and Castro that were sent the night of February 8 and in the very early morning hours of February 9, 2023. Myers texted Castro, "'I got the things from the abandoned barn,'" to which Castro responded, "[O]h, aren't we going back there tomorrow?" But Myers and Castro ultimately decided to go back that same night. 15 VRP 150. When discussing going to the barn, Myers messaged Castro:

> "Well, I need to cut the chain across the driveway. I could drop you off and open things up with you. Then I could drive the truck to the barn and we can load it up really quick. And then I can pick you guys back up afterwards. The boy wants to go like really bad and he doesn't have school tomorrow."

15 VRP at 150-51. In these messages, Castro repeatedly referred to Myers as "Boss," saying things like, "'Boss, I'm sorry, but you can just head back, 'cause I broke the ignition already'" and "'I'm ready now, boss'". 15 VRP at 148-49. The jury also heard testimony that Myers was arrested later that same day.

The jury convicted Myers of all charges. Myers appeals his convictions.

## ANALYSIS

### I. SUFFICIENCY OF EVIDENCE STANDARD

Myers argues there was insufficient evidence presented at trial to support each of his convictions. When assessing a challenge to the sufficiency of the evidence, "'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Therefore, "inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." *Id*.

"[I]nferences based on circumstantial evidence must be reasonable and cannot be based on speculation." *State v. Vasquez*, 178 Wn.2d 1, 16, 309 P.3d 318 (2013). But we do not reweigh evidence or reassess credibility, instead deferring to the trier of fact. *State v. Roberts*, 5 Wn.3d 222, 234, 572 P.3d 1191 (2025). Circumstantial and direct evidence are equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

### II. POSSESSION OF A STOLEN MOTOR VEHICLE

Myers argues that the State presented insufficient evidence to convict him of possession of a stolen motor vehicle, because there is no evidence that Myers knew that the vehicles were stolen. We disagree.

A.      Methods of Proving Knowledge

Under RCW 9A.56.068, "A person is guilty of possession of a stolen vehicle if he or she possess [possesses] a stolen vehicle." Washington courts apply the definition of "possessing stolen property" found in RCW 9A.56.140(1) to the crime of possessing a stolen vehicle. *State v. Jones*, 13 Wn. App. 2d 386, 399, 463 P.3d 738 (2020); *State v. Lakotiy*, 151 Wn. App. 699, 714, 214 P.3d 181 (2009). That statute provides, "'Possessing stolen property' means knowingly to receive, retain, possess, conceal, or dispose of stolen property knowing that it has been stolen and to withhold or appropriate the same to the use of any person other than the true owner." RCW 9A.56.140(1).

"Bare possession of stolen property is insufficient to justify a conviction." *State v. McPhee*, 156 Wn. App. 44, 62, 230 P.3d 284 (2010). But "possession of recently stolen property combined with slight corroborative evidence of other inculpatory circumstances tending to support guilt will sustain a conviction for possession of stolen property." *Jones*, 13 Wn. App. 2d at 401 (citing *State v. Portee*, 25 Wn.2d 246, 253-54, 170 P.2d 326 (1946)).

Consistent with these statutory requirements, the trial court instructed the jury in relevant part that the State had to prove "the defendant acted with knowledge that the motor vehicle had been stolen." CP at 165. The trial court further instructed the jury:

A person knows or acts knowingly or with knowledge with respect to a fact, circumstance, or result when he or she is aware of that fact, circumstance, or result.

*If a person has information that would lead a reasonable person in the same situation to believe that a fact exists, the jury is permitted but not required to find that he or she acted with knowledge of that fact*.

CP at 155 (emphasis added).

In *Jones*, the State relied on improperly completed trip permits, a missing license plate, damage to the car's steering wheel, a socket extension used to start the car, and shaved keys as circumstantial evidence that a car was stolen. *Jones*, 13 Wn. App. 2d at 397. In addition, Jones attempted to flee when a deputy passed Jones in his car. *Id.* at 391, 402. Although the defendant claimed he did not know the car was stolen, Division Three held there was sufficient corroborative evidence to satisfy the knowledge element. *Jones*, 13 Wn. App. 2d at 401-02.

B.    Analysis

Here, the cars in question exhibited similar characteristics of having been stolen. Two of the vehicles had a damaged steering column or ignition, and Myers was using a screwdriver to start the 1997 Nissan truck. The 1993 Nissan truck was missing its battery. All of the vehicles had been stolen within the prior three weeks. Drawing all inferences in the light most favorable to the State, a reasonable person, knowing that the ignitions were damaged, the license plates were missing, and the use of an invalid trip permit, could have inferred that the vehicles were stolen.

Myers argues in his reply brief that *Jones* is distinguishable because Jones attempted to flee from police while Myers did not. However, *Jones* did not hold that flight is a necessary element to establish knowledge for vehicle theft; Jones' flight was treated as one of many factors that the court considered as corroborating circumstances that supported the inference that Jones had knowledge that the car was stolen. 13 Wn. App. 2d at 401. Rather than flight, there was other evidence that Myers was aware of or involved in car thefts with Castro. The evidence included texts between Myers and Castro that referred to Myers not needing to meet Castro after all because Castro had "broke[n] the ignition already." 15 VRP at 148. And in this text chain, Castro referred to Myers as "Boss." *Id.*

Myers similarly argues that he did not know that the cars were stolen because the cars belonged to his friend, Castro. But again, we consider whether a rational trier of fact could have found knowledge beyond a reasonable doubt, viewing the evidence in the light most favorable to the State. The jury could have drawn an inference about Myers' relationship with Castro from the texts in which Castro referred to Myers as "'boss.'" 15 VRP at 148. The jury was not required to accept Myers' explanation. *State v. Couet*, 71 Wn.2d 773, 776, 430 P.2d 974 (1967) (holding that the jury was not required to accept the defendant's explanation that he was just using the stolen vehicle while a friend was on vacation). Moreover, the lack of a plausible explanation for why the stolen vehicles were on the property was also a factor the jury could consider when evaluating whether there was sufficient evidence of knowledge. *Jones*, 13 Wn. App. 2d at 401.

In sum, taking the State's evidence as true, the jury could have drawn reasonable inferences that Myers both possessed the three stolen vehicles and knew that they were stolen. Accordingly, we hold there was sufficient evidence to support Myers' three convictions for possession of a stolen motor vehicle.

### III. THIRD DEGREE THEFT AND SECOND DEGREE BURGLARY

Myers argues that the State presented insufficient evidence to convict him of third degree theft because there is insufficient evidence that he in fact stole a tile cutter. He also asserts that there was insufficient evidence to establish that the second degree burglary and third degree theft occurred on or around February 8 or 9 as required in the jury instructions. We disagree.

A.      Third Degree Theft and Second Degree Burglary

RCW 9A.56.050(1) provides: "A person is guilty of theft in the third degree if he or she commits theft of property or services which (a) does not exceed seven hundred fifty dollars in

value." The definition of "theft" under RCW 9A.56.020(1)(a) is "[t]o wrongfully obtain or exert unauthorized control over the property or services of another or the value thereof, with intent to deprive him or her of such property or services."

The Washington Supreme Court has held that value is not an essential element of third degree theft because a theft of something of any value can constitute third degree theft. *State v. Tinker*, 155 Wn.2d 219, 222, 118 P.3d 885 (2005). Therefore, the State does not have to prove the actual value of what was stolen, just that anything of value was stolen. *Id.* Moreover, the fact finder can rely on circumstantial evidence to support the conviction. *State v. Britten*, 46 Wn. App. 571, 574, 731 P.2d 508 (1986) (concluding the fact finder was entitled to rely on circumstantial evidence that the defendant removed the tags from stolen clothes before taking them from a store).

Accordingly, the trial court instructed the jury on the elements of third degree theft consistent with these requirements. In relevant part, the trial court instructed the jury,

> To convict the defendant of the crime of theft in the third degree . . . , each of the following three elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about or between February 8[th] and February 9[th], 2023, the defendant wrongfully obtained or exerted unauthorized control over property of another or the value thereof.

CP at 169.

RCW 9A.52.030(1) provides that someone is guilty of second degree burglary "if, with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building other than a vehicle or a dwelling." "'[I]ntent to commit a crime may be inferred if the defendant's conduct and surrounding facts and circumstances plainly indicate such an intent as a matter of logical probability.'" *Vasquez*, 178 Wn.2d at 8 (quoting *State v. Woods*, 63 Wn. App. 588, 591, 821 P.2d 1235 (1991)).

Consistent with these provisions, the trial court instructed the jury on the elements of second degree burglary, in relevant part:

> To convict the defendant of the crime of burglary in the second degree . . . , each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about or between February 8[th] and February 9[th], 2023, the defendant entered or remained unlawfully in a building;
>
> (2) That the entering or remaining was with intent to commit a crime against a person or property therein.

CP at 168.

Myers relies on *State v. Hickman* for the principle that if a fact like dates is included in the to-convict instruction, then the State has to prove that fact to the jury. 135 Wn.2d 97, 102, 954 P.2d 900 (1998). Even though, generally, the date of an offense is not an essential element of the crime, *State v. Brooks*, 195 Wn.2d 91, 98, 455 P.3d 1151 (2020), the State acknowledges that based on the jury instructions, it had to prove at trial that Myers executed the crimes related to the theft from the barn on or about February 8 and 9.

B.      Evidence of Theft

Through TJ's testimony and the texts between Myers and Castro, the State presented evidence to show that Myers broke into the barn and took a variety of items on the night before Myers was arrested, including a chair and antique items. Myers focuses on the tile cutter specifically. However, the jury was not required to find theft of the tile cutter because neither the amended information nor the to-convict instruction for theft in the third degree specifically mentioned the tile cutter, so the jury only had to find that Myers stole *something* of value on the night in question. And TJ testified that they removed "a chair, some antique items, wooden, and a

small, [] toy red trailer" from the barn on the night before Myers was arrested. 17 VRP at 359. Text messages between Myers and Castro sent on the same night corroborate TJ's testimony.

Viewing this evidence in the light most favorable to the State, a reasonable jury could find that Myers wrongfully exerted unauthorized control over property of another when he took items from the barn and that he intended to deprive the barn's owner of the items. Because the State only had to prove that Myers stole something of any value, the State did not have to prove that Myers stole the tile cutter specifically.

C.      Evidence of the Timing of the Burglary and Theft

Next, Myers argues that the State included in its second amended information and in the jury instruction that the burglary and theft from the barn occurred "on or about or between February 8, 2023 and February 9, 2023." Myers argues the State failed to prove the burglary and theft occurred in this time period. CP at 129.

The texts between Myers and Castro sent on the night of February 8 discussed visiting the barn that night or the next day, February 9. TJ also testified about stealing items from the barn the night before Myers was arrested, and Myers was arrested on February 9, 2023. Taking all of the State's evidence as true, a rational person could infer that Myers unlawfully entered the barn and took something of value from the barn on February 8 or 9.[1]

Thus, we hold that there was sufficient evidence to support the challenged elements of Myers' third degree theft conviction and the burglary conviction.

---

[1] Myers does not challenge the sufficiency of the evidence to support any other element of Myers' burglary conviction.

IV. THIRD DEGREE MALICIOUS MISCHIEF

Finally, Myers argues that the State presented insufficient evidence to convict him of third degree malicious mischief. He asserts that unlike the burglary and theft, there is no evidence to support that the breaking of the lock on the barn door, which was the basis for the malicious mischief charge, occurred during February 8 or February 9, 2023. And because there is evidence Myers put his own lock on the barn door, the evidence suggests the barn owner's lock was broken well before the night of the charged burglary. We disagree and conclude that the evidence of timing was sufficient for this charge.

RCW 9A.48.090(1)(a) states that a person is guilty of third degree malicious mischief if they "(a) [k]nowingly and maliciously cause[] physical damage to the property of another, under circumstances not amounting to malicious mischief in the first or second degree." For third degree malicious mischief, there is no monetary element, so it is sufficient to show that some physical damage occurred. *State v. Timothy K.*, 107 Wn. App. 784, 790, 27 P.3d 1263 (2001). Accordingly, the trial court instructed the jury in relevant part that to convict Myers of third degree malicious mischief, the jury had to find beyond a reasonable doubt "[t]hat on or about or between February 8[th] and February 9[th], 2023, the defendant knowingly and maliciously caused physical damage to the property of another." CP at 170.

In *State v. Sanchez*, the defendant was convicted of multiple counts of violating a domestic violence no-contact order and witness tampering. 31 Wn. App. 2d 372, 554 P.3d 373 (2024) *review denied*, 4 Wn. 3d 1004, 561 P.3d 747 (2025). Division Three concluded that even with the date as an added element in the jury instructions, the State only needed to "prove that the crimes occurred around the time of the alleged date" to satisfy the "on or about" requirement. *Sanchez*, 31 Wn.

App. 2d at 380. In *State v. Polk*, Division Three used similar reasoning to approve wide range of possible dates, stating that "[w]hile the date established by the testimony does not exactly match the November 17 date alleged by the State," testimony provided at trial that a particular act (scanning an image) could have happened "prior to December 9 [was] sufficient to establish that the offense occurred on or about November 17." 187 Wn. App. 380, 395, 348 P.3d 1255 (2015). Given this application of "on or about" in jury instructions, "on or about" can encompass weeks, not just days, in some circumstances.

TJ's testimony established that Myers went to a building he did not own and replaced the original lock with one of his own. Texts between Myers and Castro corroborated TJ's testimony. And under *Polk*, "on or about" can extend to a wider date range up to within weeks of the dates named in the jury instructions. 187 Wn. App. at 395.

The State emphasizes that even assuming Myers broke the barn owner's lock before February 8, there was still sufficient evidence that the malicious mischief happened within the acceptable date range under *Polk* because the barn owner or his handyman went to the barn every week or every other week. The owner or handyman would have noticed that Myers had broken their padlock and installed his own had those events occurred before they last visited the barn. This, along with the fact that Myers was still stealing property from the barn unnoticed, was sufficient for the jury to infer that the malicious mischief of breaking the lock happened within a week or two of February 8. Under *Polk*, this is enough to support the jury's conclusion that the malicious mischief occurred on or about February 8. *Id.*

No. 59781-1-II

Further, there was evidence that Myers physically damaged another's property by breaking the existing lock on the barn and replacing it with his own. Specifically, Myers had a key to the new lock, and TJ testified that Myers chopped off the original padlock with bolt cutters.

In sum, we conclude that there was sufficient evidence to support Myers' malicious mischief conviction.

CONCLUSION

We affirm all of Myers' convictions.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

GLASGOW, J.

We concur:

MAXA, J.

PRICE, A.C.J.

14